Susan ROGERS, Plaintiff,

v.

NEW YORK UNIVERSITY, Defendant.

No. 98 Civ.2089(GEL).

United States District Court,
S.D. New York.

Sept. 4, 2002.

James A. Brown, New York, NY, for plaintiff Susan Rogers.

Richard L. Steer, Jones Hirsch Connors & Bull P.C., New York, N.Y. (Peter T. Shapiro, Mindy H. Park), for defendant New York University, of counsel.

## OPINION AND ORDER

LYNCH, District Judge.

Plaintiff Susan Rogers brought this suit against her former employer, New York University ("NYU") alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (1994 & Supp.1999) ("ADA"); the New York State and City Human Rights Laws, New York Executive Law § 290 *et seq.*, Administrative Code of the City of New York, § 8–101 *et seq.;* and the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (1994) ("FMLA"). After considerable delay occasioned by an unsuccessful effort to require arbitration of plaintiff's claims, *see Rogers v. New York University,* 220 F.3d 73 (2d Cir. 2000), NYU now moves for summary judgment. The motion will be granted in part and denied in part.

## BACKGROUND

Rogers worked for NYU as an administrative aide from January 1993 until November 17, 1997. (Amended Compl. ¶¶ 9, 19.) In mid–1997, due to psychological difficulties later characterized as post-traumatic stress disorder and borderline personality disorder with paranoid ideation (*id.* ¶¶ 10, 13), Rogers was referred to NYU's Faculty Staff Assistance Program ("FSAP"), a confidential counseling service for employees and their families directed by Claire Fleming ("Fleming"). FSAP makes referrals as needed to physicians including psychiatrists (Ho Aff. ¶ 13), and may make recommendations regarding the necessity and length of medical leaves (*id.* ¶ 15). Prior to her referral, Rogers had been suspended for several days for insubordination (Def. R. 56.1 Statement ¶ 6), advised that future incidents of insubordination would be the cause for disciplinary action (*id.* ¶ 7), and written up for failing to follow procedures and for failing to arrive on time for work (*id.* ¶ 8).

FSAP recommended that Rogers take a leave, and with NYU's approval, Rogers

went on medical leave on April 16, 1997. She returned to work on April 29, 1997, after being cleared by a psychiatrist at New York Methodist Hospital. (Def. R. 56.1 Statement ¶ 21.) Following this short leave, Rogers's problems at work continued. (*Id.* ¶¶ 11, 21–22.) On August 22, 1997, she took a second medical leave. FSAP initially estimated that the leave would end on September 22, 1997. (Ho Aff. Ex. M.) In September, however, FSAP referred Rogers to Dr. Ernest Ferran ("Ferran"), who described Rogers's mental illness as continuing for a "duration undetermined." (*Id.* Ex. L.) On October 1, 1997, Ferran suggested that Rogers "would be best served by application for permanent disability." (Steer Aff. Ex. L.) FSAP, however, determined that Rogers's leave ought to be extended until October 10, 1997 (Ho Aff. Ex. N), and later recommended extension until October 31, 1997 (*id.* Ex. O). NYU granted both of these extensions.

The FMLA provides for up to twelve weeks of leave during a twelve-month period for "a serious health condition that makes the employee unable to perform." 29 U.S.C. 2612(a)(1)(D). Rogers's twelve weeks expired on November 14, 1997. In anticipation of that date, Roger Ho ("Ho"), NYU's Associate Director of Personnel, advised Rogers on November 6 that under NYU's FMLA policy, her job would not be held open beyond November 14, and that she could not return to work without written medical certification. (Ho Aff. Ex. G.)

Dr. Manuel Santos ("Santos"), who saw Rogers four times on referral from FSAP, wrote a letter on October 31, 1997, stating that Rogers could return to work in "one to two months," (Brown Aff. Ex. D), and setting an estimated return date of January 2, 1998, for "return to usual work" (*id.* Ex. C). However, Santos noted that even when ready to return, Rogers should be in an environment with "limited stress." (*Id.*) NYU argues that because of tensions between plaintiff and her supervisor, "limit[ing] stress" would not be possible unless NYU transferred Rogers to another position. (Def. Mem. at 10.) During her deposition, Rogers seemed to agree that a transfer away from her supervisor was necessary. (Steer Aff. Ex. E at 83.) NYU states that it "did not consider Rogers eligible for transfer" given her poor performance record. (Def. Reply at 6.) Plaintiff has not identified a specific, suitable vacant position to which she could be transferred, but asserts her willingness to return to work. (Steer Aff. Ex. E at 77; Ex. O at 6.)

Although plaintiff does not dispute that "[t]here is no evidence that any physician would have pronounced Rogers ready to return to work as of the date her FMLA leave expired or to return to her position at any time," (Pl. R. 56.1 Counter-statement ¶ 47(2)), she nonetheless points to attempts by her personal therapist Karen Hartig, CSW ("Hartig"), to communicate with NYU, claiming that Hartig considered Rogers well enough to work. (Pl. Opp. at 17–18.)[1] In her deposition, Hartig testified that while she "may have felt that the conflict between [Rogers] and [her supervisor] was too stressful for her at that time," and that Rogers "wasn't functioning to her full capacity," Rogers "was capable of returning to work" in November 1997 if

---

1. In her affidavit, Rogers claims that Hartig "attempted to certify [her] return to work" prior to the expiration of her FMLA leave. (Rogers Aff. ¶ 6.) Defendant moved to strike this portion of Rogers's affidavit, correctly noting that it is inadmissible hearsay. (Def. Mot. to Strike ¶ 5.) The Court thus will disregard Rogers's hearsay assertion, but instead will look to Hartig's deposition testimony, which contains a first-hand account of the communications in question.

"some other work arrangement could have been met" to reduce the "problem ... between her and her boss." (Brown Aff. Ex. E at 37–38.) Hartig, however, never communicated this opinion in writing to NYU. She testified, rather, that she recalls leaving telephone messages for Fleming and Ho. (*Id.* at 38.) She told Fleming "[t]hat I needed to speak to her. And I think I stated in a message that I did not agree with Dr. Santos' [sic] decision and she needed her work." (*Id.*) Her message to Ho was that she "felt that it was hurtful to [Rogers] to lose her job, to be terminated." (*Id.*)

Defendant denies that this amounted to even an attempt to certify that Rogers was fit to return to work, arguing also that any oral certification would have been insufficient because NYU requires written certification, and that NYU could reasonably rely on Santos's rather than Hartig's opinion. (Def. Reply at 3.) NYU terminated Rogers effective November 17, 1997.

On December 15, 1997, Rogers filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), and received a right to sue letter on January 13, 1998. This suit followed. In her Amended Complaint, Rogers claims that defendant violated the FMLA by terminating her and by "failing to communicate with plaintiff's regular, treating physician or her clinical social worker/therapist who

were prepared to certify plaintiff's return to work" (Amended Compl. ¶ 38), and that defendant violated the ADA by terminating her (*id.* ¶ 26) and by failing "to provide defendant a 'reasonable accommodation' [by transferring her or granting her leave]" (*id.* ¶ 40),[2] and by failing "to reasonably accommodate plaintiff by effecting a half-hour change in her daily start time at her job" (*id.* ¶ 44).[3]

## DISCUSSION

NYU seeks summary judgment dismissing the complaint on the grounds that Rogers failed to provide written medical certification clearing her return to work when her FMLA leave expired and that she could not perform the essential functions of her job with or without reasonable accommodation. Rogers appears to acknowledge that she was unable to perform her job at the relevant time unless transferred, but argues that nonetheless, she was a qualified individual with a disability under the ADA and entitled to accommodation in the form of extended leave.[4]

### I. Standard for Summary Judgment

In seeking summary judgment, NYU assumes the burden of demonstrating an absence of genuine issues as to any material fact. Summary judgment "shall be rendered forthwith if the pleadings, depo-

---

**2.** Although this paragraph of the Amended Complaint does not specify the accommodation in question, the parties agree that this cause of action refers to failure to extend leave beyond November. (Def. Mem. at 19.)

**3.** NYU seeks to have this claim dismissed with prejudice since Rogers failed to refer to it in opposing the motion, arguing that by not responding, she has abandoned her claim to this accommodation. Nothing in the record suggests how a delayed start time would assist plaintiff in performing her job, and the record contains evidence that such an accommodation would not be necessary if plaintiff

changed her medication schedule. (*See, e.g.,* Steer Aff. Ex. E at 104–106.) Accordingly, no reasonable jury could find that NYU violated the ADA by failing to change Rogers's starting time.

**4.** Since the legal standards for discrimination claims under the ADA and under New York state and city law are essentially the same, discussion of the federal ADA claims applies to the state and city claims as well. *See, e.g., Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 202 n. 2 (S.D.N.Y.1999).

sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To defeat a motion for summary judgment, "an adverse party may not rest upon the mere allegations or denials of [her] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing *DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir.1949), *cert. denied*, 338 U.S. 943, 70 S.Ct. 423, 94 L.Ed. 581 (1950)). "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). The non-moving party cannot defeat summary judgment by offering merely speculative arguments in opposition. *See Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116–17 (2d Cir.1988). Accordingly, to defeat summary judgment, the opposing party must set forth " 'concrete particulars' " showing the need for a trial. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)).

## II. *Violation of the FMLA*

■ The FMLA exists to provide job security for employees with "serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4). During a twelve-month period, an eligible employee is entitled to a total of twelve work weeks of leave. 29 U.S.C. § 2612(a)(1)(D). It is undisputed that Rogers was an eligible employee, that she received the full twelve weeks of leave provided for under the FMLA, and that her job was held open during her leave. Contrary to Rogers's argument, nothing in the statute required NYU to communicate with Hartig about Rogers's ability to return to work. The FMLA expressly permits employers to require appropriate certifications of, among other things, "the probable duration of the condition" requiring the leave. 29 U.S.C. § 2613(b)(2). Moreover, for leaves under section 2612(a)(1)(D)—taken "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position"—an employer "may have a uniformly applied practice or policy that requires each such employee to receive certification from the health care provider of the employee that the employee is able to resume work," 29 U.S.C. § 2614(a)(4). The certification, also known as a "fitness-for-duty" report, "need only be a simple statement of an employee's ability to return to work." 29 C.F.R. § 825.310(c). Hartig's ambiguous phone messages not only failed to meet NYU's reasonable requirement of a written certification, but they failed to state a date when Rogers could return to work, and failed clearly even to state that Rogers was medically fit to return, as opposed to merely stating that losing her job would be damaging to her.

In contrast, FSAP, relying on Santos's evaluation, advised NYU unambiguously and in writing that Rogers was not ready for work as of the end of her FMLA leave and would not be ready to return until at least 6 weeks later. Under the circumstances, NYU was entitled to rely on that opinion without contacting a therapist who had never submitted any certification in writing and who at best left vague tele-

phone messages indicating some disagreement with Santos. Accordingly, Rogers's causes of action under the FMLA are dismissed.

## III. *Violation of the ADA*

Although NYU satisfied its obligations under the FMLA, it has a separate and independent set of obligations under the ADA and state anti-discrimination laws. The leave provisions of the FMLA are "wholly distinct from the reasonable accommodation obligations of employers" under the ADA. 29 C.F.R. § 825.702(a). The FMLA's requirement of twelve weeks of leave thus does not establish as a matter of law that a leave of longer than twelve weeks would not be a reasonable accommodation of a disability under the ADA. Under the governing federal regulations, "[a]n employer must ... provide leave under whichever statutory provision provides the greater rights to employees." 29 C.F.R. 825.702(a). In regard to Rogers, the ADA might provide greater rights. While the "FMLA entitles eligible employees to 12 weeks of leave in any 12–month period ... the ADA allows an *indeterminate amount of leave,* barring undue hardship, as a reasonable accommodation." 29 C.F.R. 825.702(b) (emphasis added).[5]

### A. *Otherwise Qualified*

■ To be protected by the ADA, an individual must be qualified, meaning the employee "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). NYU claims that Rogers was not otherwise qualified since she could not regularly attend work at the time of her termination and would require

"indefinite leave." NYU describes Santos's prediction of a January 2, 1998, return date as an uncertain indication of Rogers's future ability to work, and points to Ferran's assessment that Rogers should be placed on permanent disability. (Def. Mem. at 13.)

Plaintiff, however, has raised a triable issue of fact as to whether she could, with or without accommodation, perform the essential functions of her employment. Hartig, Rogers's personal therapist, states in her deposition that although "not functioning to her full capacity ... the job was not that demanding that [Rogers] couldn't have met the responsibilities." (Brown Aff. Ex. E at 37.) And Santos indicated that she could return to work, if her leave was extended to January 2, 1998, with the restriction of "limited stress." (Brown Aff. Ex. C.) NYU's claims that it would be impossible to limit stress so long as Rogers remained in her job, and that Santos's predicted return date was too far off to be considered more than tentative, simply raise issues of fact to be decided at trial.

■ Although the evidence creates a triable issue of fact as to Rogers's qualification to perform her job responsibilities with a reasonable accommodation, plaintiff will face a heavy burden at trial. "The ADA envisions an 'interactive process' by which employers and employees work together to access whether an employee's disability can be reasonably accommodated.... Courts have struggled to define the appropriate burdens of persuasion when that process breaks down and an employee seeks relief on the ground that his employer failed to 'reasonably accommodate' [her] disability." *Jackan v. New York State Dep't of Labor,* 205 F.3d 562,

---

**5.** NYU does not challenge the validity of these regulations as binding interpretations or im-

plementations of the governing statutes.

566 (2d Cir.2000) (internal citation omitted). In the Second Circuit, plaintiff "bears the burden of production and persuasion on the issue of whether she is otherwise qualified for the job in question." *Borkowski v. Valley Central School District,* 63 F.3d 131, 137–38 (2d Cir.1995).

Despite the burdens Rogers would have to overcome at trial, issues of fact exist as to whether her proposed accommodations would have permitted her to perform the essential functions of her position. Such questions are for a jury to resolve.

### B. *Reasonable Accommodation*

■ Rogers also would bear the burden of production and of persuasion on the *existence* of an accommodation, although the burden of persuasion on the *reasonableness* of the accommodation would fall on NYU. *See Jackan,* 205 F.3d at 567.

The parties disagree and the record is unclear concerning what accommodation Rogers sought from NYU prior to her termination. The record suggests that Rogers felt she could return to work if transferred. Hartig, for example, described the "real problem" with Rogers's return to work, not as Rogers's inability to function, but as the conflict "between [Rogers] and her boss." (Brown Aff. Ex. E at 37–38.) If Rogers required a transfer to enable her to perform the essential functions of her job, she would bear the burden of demonstrating that such a vacant position existed. *See Jackan,* 205 F.3d at 568. However, Rogers has not demonstrated—or even attempted to demonstrate—that a suitable vacant position existed at the time. In her opposition papers, Rogers does not discuss the transfer accommodation at all, and makes no showing that NYU had any vacancies for administrative aides in other departments. Since plaintiff bears the burden of demonstrating that a suitable opening was available, Rogers has failed to carry her burden that accommodation by transfer existed and any claim for failure to transfer Rogers rather than terminate her is dismissed.

Like Rogers, the Court will focus on accommodation through extension of leave. NYU claims that Rogers never requested additional leave, and thus, the alleged failure to grant it is not actionable. (Def. Reply at 7.) This argument, however, does not reflect the way in which NYU considered and processed extensions. Requests for extensions, at least those detailed in the record, came from FSAP and not directly from the employee. In Rogers's case, FSAP submitted a memorandum to NYU stating the revised projected date for the employee's return, and the recommendations were subsequently either adopted or rejected by NYU by means of an attached "Confirmation of Employee's Request for Leave of Absence." Rogers received two extensions in this manner. (Ho Aff. Exs. N, O.) Fleming submitted the same kind of memorandum to Ho on November 3, 1997, with January 2, 1998, as the revised date. (*Id.* Ex. P.) In accordance with prior dealings between FSAP and NYU, this statement put NYU on notice that Rogers sought additional leave time, and as such, could be found by a reasonable jury to be a request by Rogers and recommendation by FSAP for extended leave. NYU acknowledged the November 3 memorandum but denied the extension. (Brown Aff. Ex. A.) Whether that denial was proper and whether the accommodation was reasonable are issues properly before the Court.

■ Rogers sought an additional six weeks of leave. To prevail on a claim that an extended leave was an available accommodation, Rogers would need to demonstrate how additional time away from work would enable her to handle the stress of her relationship with her supervisor after

the leave. While this is a substantial burden, it is not as a matter of law impossible to carry. The ADA generally recognizes medical leaves as reasonable accommodations. *See* 29 C.F.R. Part 1630, Appendix. Extended leaves may also be found reasonable. *See, e.g., Durrant v. Chemical/Chase Bank,* 81 F.Supp.2d 518, 522 (S.D.N.Y.2000); *Powers v. Polygram Holding, Inc.,* 40 F.Supp.2d 195, 202 (S.D.N.Y.1999). "Since [Rogers] has introduced enough evidence to raise a factual issue as to whether, with an accommodation, she is otherwise qualified, and also has made of a prima facie case that the proposed accommodation is reasonable, a summary judgment can be entered on this issue only if [NYU] has demonstrated, as a matter of law, that the accommodation is unreasonable or that it imposes an undue hardship." *Borkowski,* 63 F.3d at 142.

NYU claims that additional leave would have been an undue hardship as defendant would have to keep Rogers's position open indefinitely because there was "no reliable indication of when she would be able to resume her duties." (Def.Mem.20–21.) NYU's position is inconsistent with Santos's evaluation, which anticipated that Rogers could return in January. "Indefinite" is not an accurate characterization of the requested accommodation, even considering that Santos recommended "limited stress" and might later have reconsidered his position on Rogers's readiness in January. During the six weeks Rogers would have been on extended leave if accommodated, NYU did not in fact fill Rogers's position but instead hired temporary workers. (Def. R. 56.1 Statement ¶ 52.) Although defendant claims such workers were costly (*id.* ¶ 51) and that some work was performed by Rogers's supervisor (*id.* ¶ 50), whether a six-week extension of her leave was reasonable is a question for a jury.

*CONCLUSION*

For the reasons set forth above, defendant's motion for summary judgment is denied as to her claim under the ADA and related state statutes that defendant denied her reasonable accommodation in the form of an extended leave, and granted as to her claims under the FMLA and all other claims.

SO ORDERED.